# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47351-8-II |
| Respondent, | |
| v. | |
| SHAWN DION OLLISON, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Shawn Dion Ollison appeals his sentence and convictions for robbery in the first degree with a deadly weapon enhancement (count I), burglary in the first degree with a deadly weapon enhancement (count II), theft of a motor vehicle (count III), attempting to elude a police vehicle with a special allegation[1] (count VII), and hit and run of an attended vehicle (count VIII). We conclude that the trial court did not violate Ollison's right to a fair trial, however, the trial court did err when calculating Ollison's offender score. We also conclude that the information was not defective. We do not consider Ollison's claim that he received ineffective assistance of counsel. Therefore, we affirm Ollison's convictions, but remand for resentencing.

---

[1] The State alleged that Ollison "committed the aforesaid Eluding while endangering one or more persons other than himself or the pursuing law enforcement officer." Suppl. Clerk's Papers (CP) at 3; RCW 9.94A.834.

FACTS

On the morning of August 25, 2014, Ollison entered the home of a complete stranger, Aleta Miller. He entered her kitchen as she was getting ready to leave for work.[2] Ollison held a "big stick" like a baseball bat. 1 Report of Proceedings (RP) at 111. It measured approximately two inches by two inches in circumference and three feet in length. Ollison demanded Miller give him her keys to her Subaru Forrester. He said to Miller that it was a "matter of life and death," and if she did not cooperate he would "smash [her]." 1 RP at 111, 122. Miller found her keys and gave them to Ollison. Ollison also grabbed $60 in cash from Miller's hand before exiting the house. Miller followed Ollison outside and began to dial 911, but Ollison heard the phone's key pad beeping, and he yelled at her not to call anyone or he would kill her. As Ollison began to come back towards Miller, she threw her cell phone into some nearby plants. Ollison went after the phone and retrieved it. Miller ran towards her neighbor, Bob Rude's, house and yelled for help.

Rude came outside, quickly went into his own house, and then returned outside with a gun. At this point, Ollison entered Miller's car and tried to exit the driveway. Rude told Ollison at gunpoint to get out of the car. Miller closed the iron gate blocking her driveway to prevent Ollison from leaving. With Rude pointing the gun at him, Ollison exited the car, left the door open, and laid down on the ground. Miller left to find Rude's wife to call 911. They called 911 for assistance. Ollison repeatedly said to Rude, "Shoot me, shoot me. It's a matter of life and death. Just shoot me." 1 RP at 135. A passerby who knew Rude stopped to help. During the commotion, Miller's dog jumped into her car. Ollison eventually got up from the ground and approached the fence while challenging Rude to shoot him. Ollison reentered Miller's car and drove as fast as he could

---

[2] The house is located in Olympia, Washington.

through the chain link fence. He drove straight toward Rude, his wife, and the passerby. The three witnesses had to jump out of the way of the vehicle to avoid injury.

After Ollison drove away, Sheriff John Snaza drove towards Miller's house in response to the 911 call. Tumwater police saw and began to follow the vehicle. Ollison failed to stop. Snaza monitored the radio traffic and heard that the vehicle was approaching his location. He activated his emergency lights and siren and drove in Ollison's direction. Snaza and other law enforcement vehicles followed Ollison onto Interstate-5 southbound. Ollison made "erratic lane changes." 2 RP at 211. Because of the Ollison's speed and erratic driving on Interstate-5, Snaza remained the only police vehicle in pursuit. Ollison and Snaza drove at speeds fluctuating between 80 and 125 miles per hour while zig-zagging around cars and driving on the freeway's shoulder and all lanes of travel.

Deputy Steve Hamilton deployed spike strips on the freeway, and Ollison drove over them. He continued to drive at 90 miles per hour without front tires; only the rims remained. As he drove, Ollison hit another vehicle and injured the driver. Deputy Ruben Mancillas attempted a PIT maneuver.[3] He pushed the car against a barrier and brought it to a complete stop. Mancillas ordered Ollison out of the vehicle, but when Ollison did not make an effort to do so, Mancillas broke the passenger side window and Ollison crawled out. Mancillas placed Ollison under arrest. Miller's dog, cell phone, and cash were retrieved from the vehicle.

The State charged Ollison by second amended information with robbery in the first degree while armed with a deadly weapon (count I), burglary in the first degree while armed with a deadly weapon (count II), theft of a motor vehicle (count III), three counts of assault in the second degree

---

[3] A PIT maneuver, or precision immobilization technique, is a pursuit tactic by which a pursuing car can force a fleeing car to abruptly turn sideways, causing the driver to lose control and stop.

(counts IV, V, VI), attempting to elude a pursuing police vehicle with a special allegation (count VII), and hit and run attended vehicle (count VIII). The charge of robbery in the first degree while armed with a deadly weapon[4] read as follows:

> In that the defendant, SHAWN DION OLLISON in the State of Washington, on or about August 25, 2014, did unlawfully take personal property from a person or in his or her presence, to-wit, Aleta Miller, against such person's will, by use or threatened use of immediate force, violence, or fear of injury to such person or their property, or the property of another, with the intent to commit theft of the property, and such force or fear having been used to obtain or retain such property or to prevent or overcome resistance to the taking, and in the commission of or immediate flight therefrom the accused was armed with a deadly weapon or displayed what appeared to be a firearm or other deadly weapon. It is further alleged that during the commission of this offense the defendant was armed with a deadly weapon.

Suppl. CP at 2.

I.    TRIAL

The State filed a motion in limine for an order that Ollison be restrained with a leg brace during trial. The State argued that the use of a restraint was warranted because Ollison was a flight risk and a danger to the public.

On March 3, 2015, the trial court heard testimony and argument on the motion. Officer Trevor Davis, a correctional officer was the sole witness. The jail classified Ollison as "maximum" security because of his charges. 1 RP at 27. Davis described the leg brace proposed for use as the "least restrictive restraint" that the corrections department had at its disposal. 1 RP at 27. The leg brace consists of a hinge bar that goes around the side of the leg. It can be adjusted by the defendant with a latch that allows the hinge to bend. It also includes four straps, three of which are Velcro, and one leather strap at the ankle which contains a locking mechanism that secures the brace to

---

[4] The State charged a deadly weapon enhancement under RCW 9.94A.825.

4

the body. The restraint would not cause Ollison pain and would not be visible to the jurors. Two corrections officers would be required to be in the courtroom at all times because of Ollison's jail classification. The brace would not allow Ollison to have a normal gait; it prevented full motion of steps.

The trial court granted the State's motion and required Ollison to wear the brace throughout trial. The trial court reasoned that the use of the leg brace was appropriate because Ollison's bail was set for a significant amount based on the charges and the jail determined Ollison to be at the "maximum custody level" 1 RP at 40. The trial court also found that the brace was not painful, Ollison controlled the ability to unlock it, and it was not noticeable under Ollison's clothing. The trial court also ensured it would take precautions to make sure the brace would not be noticeable to the jury if Ollison moved about the courtroom.

The jury found Ollison not guilty of three counts of assault in the second degree (counts IV, V, VI) and guilty of all other counts.

II.     SENTENCING

Ollison filed a sentencing memorandum and argued that robbery in the first degree and theft of a motor vehicle (counts I and III) constituted the same criminal conduct because they involved the same victim, Miller. Ollison also argued that the crimes were committed in the same time and place, and the offenses involved the same criminal intent. The memorandum further argued that Ollison's offender scores should be calculated as follows:

| COUNT | SCORE | EXPLANATION |
|-------|-------|-------------|
| I | 3 | 2 points for Count II, a violent offense, and 1 point for Count VII |
| II | 4 | 2 points for Count I, a violent offense, and 1 point for Count III |
| III | 2 | 1 point for Count II and 1 point for Count VII |
| VII | 4 | 1 point each for Counts I, II, III, and VIII |
| VIII | GM | Gross misdemeanor with sentence of 0-364 days in jail. |

CP at 166.

The trial court heard arguments on Ollison's offender score calculation. The court found that the offenses of robbery in the first degree and theft of a motor vehicle constituted the same criminal conduct because "[t]aking the keys essentially was the beginning of the course of conduct that included taking the motor vehicle." RP (Mar. 24, 2015) at 23. The State disagreed with Ollison's calculation; however, the parties eventually agreed to Ollison's points.

The trial court entered the judgment and sentence. The trial court calculated Ollison's offender score as the parties agreed, with a score of three for count I, a score of four for count II, a score of two for count III, and a score of four for count VII. The trial court sentenced Ollison to 108 months of confinement. Ollison appeals.

## ANALYSIS

I.    RIGHT TO FAIR TRIAL

Ollison argues that the trial court violated his right to a fair trial by ordering him to wear a leg restraint. We disagree.

A.    Legal Principles

"It is well settled that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances." *State v. Finch*, 137 Wn.2d 792, 842, 975 P.2d 967 (1999). This rule ensures that "the defendant receives a fair and impartial trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 22 (amendment 10) of the Washington State Constitution." *Finch*, 137 Wn.2d at 843.

We review a trial court's decision to shackle, or to restrain the movement of, a defendant for abuse of discretion. *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001). A trial court abuses its discretion when its decision is based on untenable grounds or untenable reasons. *Turner*, 143 Wn.2d at 724. "A discretionary decision rests on untenable grounds if it is unsupported by

6

the facts in the record." *State v. Walker*, 185 Wn. App. 790, 800, 344 P.3d 227, *review denied*, 183 Wn.2d 1025 (2015).

"'It is fundamental that a trial court is vested with the discretion to provide for courtroom security, in order to ensure the safety of court officers, parties, and the public.'" *Turner*, 143 Wn.2d at 725 (quoting *State v. Hartzog*, 96 Wn.2d 383, 396, 635 P.2d 694 (1981)). At the same time, a criminal defendant is entitled to be free from restraints at trial except under extraordinary circumstances. *State v. E.J.Y.*, 113 Wn. App. 940, 951, 55 P.3d 673 (2002). Washington courts have "universally held that restraints should 'be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.'" *Finch*, 137 Wn.2d at 846 (quoting *Hartzog*, 96 Wn.2d at 398). Restraints are disfavored because "'they may abridge important constitutional rights [such as], the presumption of innocence, the privilege of testifying on one's own behalf, and the right to consult with [and assist] counsel during trial.'" *Turner*, 143 Wn.2d at 725 (quoting *Hartzog*, 96 Wn.2d at 398); *Finch*, 137 Wn.2d at 845. By keeping the defendant in restraints, the court might deprive him of the full use of all his faculties. *State v. Damon*, 144 Wn.2d 686, 691, 25 P.3d 418 (2001).

Only after conducting a hearing and entering sufficient findings into the record should a trial court allow the use of restraints. *Damon*, 144 Wn.2d at 691-92. The court must also consider less restrictive alternatives. *Finch*, 137 Wn.2d at 850. The trial court "'must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury. That discretion must be founded upon a factual basis set forth in the record.'" *E.J.Y.*, 113 Wn. App. at 951 (quoting *Hartzog*, 96 Wn.2d at 400). The trial court abuses its discretion unless the basis for its decision is evidence that indicates the defendant poses an imminent risk of escape, the defendant intends to injure someone in the courtroom, or the

defendant cannot behave in an orderly manner while in the courtroom. *Finch*, 137 Wn.2d at 850. "'A broad general policy of imposing physical restraints . . . because [the defendant] may be potentially dangerous is a failure to exercise discretion.'" *Finch*, 137 Wn.2d at 846 (quoting *Hartzog*, 96 Wn.2d at 400) (internal quotations omitted).

### B.    The Trial Court Did Not Abuse Its Discretion

Several factors need to be considered by the trial court when deciding whether a defendant should be restrained during trial.

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*State v. Hutchinson*, 135 Wn.2d 863, 887-88, 959 P.2d 1061 (1998) (quoting *Hartzog,* 96 Wn.2d at 400).

Here, the trial court heard testimony from Davis. It granted the motion to restrain Ollison after it considered the seriousness of the charges against Ollison, including a charge that indicated he presented a flight risk. The trial court also reasoned that the brace was the least restrictive option available and that it would not be painful or noticeable to the jury. The trial court considered Ollison's jail classification and the need to make sure he remained in custody. Therefore, we conclude that the trial court did not abuse its discretion because it based its decision on tenable grounds and for tenable reasons.

8

II.     OFFENDER SCORE CALCULATION

Ollison argues that the trial court erred by calculating his offender score for his convictions of burglary in the first degree and attempting to elude a police vehicle because the trial court added an extra point based on his conviction of theft of a motor vehicle even though it found that the theft of a motor vehicle conviction constituted the same criminal conduct as his robbery in the first degree conviction. The State concedes that the trial court erred and recommends the case be remanded for resentencing. We agree.

RCW 9.94A.589(1)(a) provides, "if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. Sentences imposed under this subsection shall be served concurrently." "Same criminal conduct" is defined by the statute as "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). The trial court found that Ollison's convictions for robbery in the first degree and theft of a motor vehicle constituted the same criminal conduct, but counted the crimes separately when it calculated Ollison's offender score. Therefore, we remand the case for resentencing.[5]

III.    INFORMATION CHARGING ROBBERY IN THE FIRST DEGREE

Ollison argues that the charging document was defective because it failed to allege all of the essential elements of robbery in the first degree. We disagree.

---

[5] Ollison argues that he received ineffective assistance of counsel because his attorney failed to object to the miscalculation of his offender score and even agreed to the calculation. Because we are remanding this case for resentencing, we need not address Ollison's ineffective assistance of counsel claim.

A.      Standard of Review

An information is constitutionally defective if it fails to list the essential elements of a crime. *State v. Zillyette*, 178 Wn.2d 153, 158, 307 P.3d 712 (2013); CrR 2.1(a)(1). The essential elements of the crime are those "'that the prosecution must prove to sustain a conviction.'" *State v. Peterson*, 168 Wn.2d 763, 772, 230 P.3d 588 (2010) (quoting *State v. Fisher*, 165 Wn.2d 727, 754, 202 P.3d 937)) (internal quotations omitted). "Requiring the State to list the essential elements in the information protects the defendant's right to notice of the nature of the criminal accusation guaranteed by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution." *State v. Pittman*, 185 Wn. App. 614, 619, 341 P.3d 1024, *review denied*, 184 Wn.2d 1021 (2015). Due to the constitutional nature of the challenge to the sufficiency of an information, we review claims that the information omitted essential elements of a charged crime de novo. *Pittman*, 185 Wn. App. at 619.

When an appellant challenges the sufficiency of an information, we must first decide whether the allegedly missing element is essential. *Pittman*, 185 Wn. App. at 619. "Charging documents which are not challenged until after the verdict will be more liberally construed in favor of validity than those challenged before or during trial." *State v. Kjorsvik*, 117 Wn.2d 93, 102, 812 P.2d 86 (1991). We must determine whether "'the necessary facts appear in any form, or by fair construction can be found within the terms of the indictment.'" *Kjorsvik*, 117 Wn.2d at 104 (quoting *Hagner v. United States*, 285 U.S. 427, 433, 52 S. Ct. 417, 76 L. Ed. 861 (1932)).

"Missing elements may be implied if the language supports such a result." *State v. Hopper*, 118 Wn.2d 151, 156, 822 P.2d 775 (1992); *State v. Miller*, 156 Wn.2d 23, 28, 123 P.3d 827 (2005). Even if we find the missing element is implied, we then determine whether the defendant can nonetheless show he suffered actual prejudice from the inartful language. *Kjorsvik*, 117 Wn.2d at 105.

> **B.     The Information Was Not Defective**

The State charged Ollison with robbery in the first degree while armed with a deadly weapon. RCW 9A.56.190 defines robbery in relevant part:

> A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial.

Ollison argues that the information's language failed to include a non-statutory essential element, i.e. that the victim had an ownership, representative, or possessory interest in the stolen property. He argues that by failing to list this element, the information did not apprise him of the nature of the charge.

We first determine whether this alleged element is in fact an essential element. *Pittman*, 185 Wn. App. at 619. In *State v. Richie*, 191 Wn. App. 916, 924, 365 P.3d 770 (2015), we held that an implied element of robbery included the victim having an ownership, representative, or possessory interest in the stolen property. Other cases are in accord. *State v. Tvedt*, 153 Wn.2d 705, 714, 107 P.3d 728 (2005); *State v. Latham*, 35 Wn. App. 862, 670 P.2d 689 (1983); *State v. Hall*, 54 Wn. 142, 102 P. 888 (1909).

Because of this conclusion, we next determine whether "'the necessary facts appear in any form, or by fair construction'" in the information. *Kjorsvik*, 117 Wn.2d at 104 (quoting *Hagner*, 285 U.S. at 433). Here, the State listed the name of the property owner in the information. Washington courts have concluded that similar language puts a defendant on notice of the charges against him. *Tvedt*, 153 Wn.2d at 719; *Kjorsvik*, 117 Wn.2d at 111. In reading the information, it is clear that the property alleged to be stolen by Ollison was Miller's property. In liberally construing the document, we conclude that the language reasonably apprised Ollison that the State alleged he unlawfully took property away from Miller in which she had an ownership, representative, or possessory interest. Therefore, the information adequately apprised Ollison of the charge against him.

Finally, we conclude that because Ollison did not argue that he suffered prejudice, his claim fails. *See Kjorsvik*, 117 Wn.2d at 105. In deciding this issue, we also note that Ollison neither raised this issue before the trial court, nor requested a bill of particulars. If an information lists all statutory elements but is vague regarding another matter significant to the defense, a defendant should request a bill of particulars to correct that defect. *State v. Holt*, 104 Wn.2d 315, 320, 704 P.2d 1189 (1985). A defendant cannot challenge the information on appeal if he failed to request a bill of particulars. *Holt*, 104 Wn.2d at 320. For the foregoing reasons, Ollison's claim fails.

We affirm the convictions, but remand the case for resentencing because of the error in Ollison's offender score calculation.

47351-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Lee, P.J.

Sutton, J.

13